UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CARL A. B., et al.,                       )
                                          )
              Plaintiffs,                 )
                                          )
       v.                                 )        Case No. 1:22CV84
                                          )
BLUE CROSS BLUE SHIELD OF                 )
NORTH CAROLINA, et al.,                   )
                                          )
              Defendants.                 )
                                          )


MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

       This matter is before the Court on cross-Motions for Summary Judgment filed by

Plaintiffs [Doc. #96] and Defendants [Doc. #102]. In this action, Plaintiffs seek payment of

claims for L.B.'s treatment at Open Sky Wilderness ("Open Sky"), a residential treatment

facility in Durango, Colorado from July 14 through September 27, 2017, pursuant to the

Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. §§ 1001-

1461.

       For the reasons set out below, the Court recommends that Plaintiffs' Motion for

Summary Judgment be denied, Defendants' Motion for Summary Judgment be granted, and

this matter be dismissed with prejudice.

I.     ALLEGATIONS IN COMPLAINT AND PROCEDURAL HISTORY

       The following facts are taken from Plaintiffs' Second Amended Complaint

("Complaint" or "Compl.") [Doc. #52], the operative Complaint. Plaintiffs allege that

Plaintiff Carl A. B. ("Carl"), is covered by the Blue Cross Blue Shield of North Carolina (hereinafter "Blue Cross NC") Blue Options PPO (hereinafter "the Plan") provided through his employer, that Carl's daughter L.B. is a beneficiary of his health insurance plan, and that the Plan is an employee benefit plan governed by ERISA. (Compl. ¶¶ 1-4.) Plaintiffs seek payment of claims for L.B.'s treatment at Open Sky.

As background, Plaintiffs allege that beginning in ninth grade, L.B. developed a purging habit and eating disorder, began experimenting with substances, including alcohol and marijuana, and drank heavily. (Compl. ¶ 8.) Plaintiffs allege that L.B. was enrolled and admitted to Timberline Knolls Residential Treatment Center for approximately one month and was subsequently enrolled in an outpatient facility, and that she had discontinued binging and purging, but resumed at some point during outpatient treatment, and her alcohol use increased again. (Compl. ¶ 9.) Plaintiffs allege that L.B. had several physical altercations with her mother and her sister throughout her sophomore year of high school, her alcohol use continued to increase, she was diagnosed with ADHD, and she began taking ADHD medications. (Compl. ¶¶ 10-11.) Plaintiffs allege that between 2015 and 2017, L.B. became intoxicated to the point where she had to be hospitalized on multiple occasions. (Compl. ¶ 12.) Plaintiffs allege that L.B. threatened suicide multiple times and was hospitalized for threatening suicide and for excessive intoxication. (Compl. ¶¶ 12-13.) Plaintiffs allege that in May 2017, L.B. became extremely intoxicated and began damaging their home, that Carl attempted to restrain her to prevent further damage and ultimately decided she was too out of control and called the police, and that while a Sheriff's Deputy was attempting to talk to L.B., she "stormed up the stairs and threw a vase down the stairs, shattering it," resulting in a shard

2

from the vase injuring the Sheriff's Deputy. L.B. was immediately arrested for felony assault on a law enforcement officer and placed in jail. (Compl. ¶ 16.) Plaintiffs allege that Carl "realized [L.B.] was at a critical, emergent stage and needed help," and he bailed her out of jail, and contacted a consultant to assist in finding a treatment program. (Compl. ¶ 17.) Plaintiffs allege that L.B. was enrolled in Open Sky Wilderness Therapy two months later, in July 2017, and attended the program for two months until September 2017, and then continued outpatient therapy at Hopeway Center. (Compl. ¶ 18.)

With respect to the pre-litigation appeal process, Plaintiffs allege that the family submitted claims to BlueCross for L.B.'s residential treatment at Open Sky, and received notice of denied coverage of her treatment through a series of Explanations of Benefits dated July 3, 2018, July 4, 2018, and August 14, 2018, stating that the claims were denied because the service was "provided without authorization." (Compl. ¶¶ 21-22.) Plaintiffs allege that Carl submitted a level-one member appeal to the Plan on December 13, 2018, arguing that the Plan offered retrospective reviews in cases of emergency, requesting a retrospective review of L.B.'s treatment, and arguing that Open Sky was a covered service under the Plan because the Exclusions section of the Summary Plan Description contained no information that would lead Carl to believe that Open Sky was an excluded service and because Open Sky met the Plan's definition of a provider. (Compl. ¶¶ 23-24.) Plaintiffs allege that on December 20, 2018, the Plan sent Carl a letter stating that the request should be handled by Magellan Healthcare and forwarded the request for review to Magellan Healthcare, and Plaintiffs allege that Magellan Healthcare did not respond to the first appeal until March 5, 2019, more than 30 days after the appeal was filed. (Compl. ¶¶ 26-27.) Plaintiffs allege that on March 26, 2019,

Carl wrote a complaint to the North Carolina Department of Insurance due to the Plan's delayed response to the level one-member appeal, and on April 10, 2019, the Plan wrote a letter to the North Carolina Department of Insurance stating that Magellan Healthcare's records indicate that a decision was made on January 14, 2019, but Magellan Healthcare was unable to produce a copy of the letter, and the Plan attached a duplicate copy which was generated on March 5, 2019, which Plaintiffs allege was the first response that they had received from Magellan Healthcare. (Compl. ¶¶ 35-36.) Plaintiffs allege that Magellan Healthcare upheld the denial based on the 2019 Magellan Care Guidelines for Residential Behavioral Health Level of Care, claiming that L.B.'s "symptoms do not appear to require a []twenty-four (24) hour per day, seven (7) day per week treatment facility to help you learn how to take care of your daily living needs for one or more of the following reasons: You are reported to be able to care for your physical needs. You are not reported to be at risk [f]or being dangerous to yourself or others. Where you live does provide the help you need to get better. Your current symptoms would be safely treated at a less restrictive level of care." (Compl. ¶¶ 27-28.) Plaintiffs allege that Carl submitted a second-level member appeal on August 22, 2019, and argued that L.B.'s treatment at Open Sky met the Plan's definition of medically necessary. (Compl. ¶¶ 37-39.)

Plaintiffs originally filed this action in the District of Utah, and the case was subsequently transferred to this Court. Plaintiffs were given leave to amend the Complaint, and ultimately filed the Second Amended Complaint, now the operative Complaint in this matter, raising a single cause of action for recovery of benefits under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B).

4

Defendants moved for dismissal [Doc. #53], which was denied [Doc. #77, #87]. The Parties then filed cross-Motions for Summary Judgment [Doc. #96, #102]. The Parties have filed the Administrative Record in this case [Doc. #94-1, #94-2] and the matter is ripe for the Court's consideration.

II.   STANDARD OF REVIEW

   A.   Motion for Summary Judgment

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (noting that a non-moving party may not rest upon mere allegations or denials.) Thus, "plaintiffs need to present more than their own

5

unsupported speculation and conclusory allegations to survive" a motion for summary judgment. Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 780 (4th Cir. 2023).

B.    Recovery of Benefits under 29 U.S.C. § 1132(a)(1)(B)

Plaintiffs seek to recover benefits due under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B). Specifically, Plaintiffs seek judgment in the amount of L.B.'s past due treatment claim from Open Sky from July 14, 2017, through September 27, 2017, pre- and post-judgment interest, and attorney's fees. (Compl. ¶¶ 43-46.)

Section § 1132(a)(1)(B) allows "a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1001 et seq.; 29 U.S.C. § 1132(a)(1)(B)). In Glenn, the Supreme Court noted that

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge its duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan; it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claim denials; and it supplements marketplace and regulatory controls with judicial review of individual claim denials.

Id. at 115 (citing 29 U.S.C. §§ 1104(a)(1), 1132(a)(1)(B)) (internal brackets, citations, and quotations omitted).

The Fourth Circuit has set out basic guidelines for "judicial review of ERISA plan determinations." Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358 (4th Cir. 2008).

> *First* . . . a reviewing court must be guided by principles of trust law, taking a plan administrator's determination as "a fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Second*, courts must "review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Third*, when the plan grants the administrator "discretionary authority to determine eligibility for benefits, a deferential standard of review is appropriate." And *fourth*, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."

Id. (quoting Glenn, 554 U.S. at 111) (internal citations, ellipsis, and brackets omitted). In conducting judicial review in an ERISA case, the Court ordinarily considers the record that was before the Plan Administrator. See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994). The Fourth Circuit has identified relevant factors to consider in reviewing a plan administrator's decision for reasonableness, including the language of the plan; the purposes and goals of the plan; the adequacy of the materials considered to make the decision and the degree to which they support it; whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; whether the decision-making process was reasoned and principled; whether the decision was consistent with the procedural and substantive requirements of ERISA; any external standard relevant to the exercise of discretion; and the fiduciary's motive and any conflict of interest it may have Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).

In this case, the Plan grants the administrator discretionary authority to determine eligibility for benefits. Therefore, the Parties agree that a deferential standard of review is appropriate, and the Court reviews whether Defendants' actions were an abuse of discretion, based on a review of the undisputed Administrative Record. (Defs.'s Resp. [Doc. #116] at 7-

8; Pls.'s Am. Br. [Doc. #124] at 10-11; Tr. at 66 ("[Blue Cross NC] has the authority to use its discretion to make reasonable determinations in the administration of coverage.")).[1] <u>See Sheppard & Enoch Pratt</u>, 32 F.3d at 125.

III.    <u>THE RECORD REGARDING CLAIMS BENEFITS</u>

The Parties are largely in agreement with what factually transpired in this case and with the applicable terms of the Plan.  It is in the interpretation of and application of those terms to the facts of this case that the Parties disagree.

A.    <u>The Terms of the Plan</u>

Plaintiff Carl A. B. participated in an employer-sponsored health benefit plan administered by Defendant Blue NC, for which his daughter, Plaintiff L.B., was also a beneficiary.  (Tr. at 1, 144-45, 163, 173, 1425.)  The Plan covered "Mental Health And Substance Abuse Services," and specifically stated that "[t]his health benefit plan provides benefits for the treatment of mental illness and substance abuse by a hospital, doctor or other provider."  (Tr. at 42) (capitalization omitted).  Coverage for such services was "coordinated through Magellan Behavioral Health."  (Tr. at 42.)

The Plan's coverage of mental health and substance abuse services included "inpatient treatment, and RESIDENTIAL TREATMENT FACILITY services," but the Plan specified that "PRIOR REVIEW must be requested and CERTIFICATION must be obtained in advance" for these services, except that prior authorization was not required "in EMERGENCY situations."  (Tr. at 42.)  For emergencies, the Plan required covered

---

[1] Citations to the Transcript refer to pages of the unsealed, unredacted Administrative Record [Doc. #94-1, #94-2].

8

individuals to "please notify Magellan Behavioral Health of your inpatient admission as soon as reasonably possible." (Tr. at 42.) The Plan stated that "[f]ailure to request PRIOR REVIEW and receive CERTIFICATION will result in a full denial of benefits." (Tr. at 42.)

The Plan also provided for "retrospective/post-service reviews" in, among other things, situations where review was necessary "to see if services received in an EMERGENCY setting qualify as an EMERGENCY," and the Plan provided that retrospective review "will be based on MEDICAL NECESSITY and whether the service received was a benefit under this health benefit plan." (Tr. at 57-58.) The Plan defined "MEDICALLY NECESSARY (or MEDICAL NECESSITY)" as follows:

> Those COVERED SERVICES or supplies that are:
> a) Provided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease; and, except for clinical trials as described under this health benefit plan, not for EXPERIMENTAL, INVESTIGATIONAL, or COSMETIC purposes,
> b) Necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms,
> c) Within generally accepted standards of medical care in the community, and
> d) Not solely for the convenience of the insured, the insured's family, or the PROVIDER.
>
> For medically necessary services, BCBSNC may compare the cost-effectiveness of alternative services, settings or supplies when determining which of the services or supplies will be covered and in what setting medically necessary services are eligible for coverage.

(Tr. at 79.) The Plan provided Blue Cross NC with "the authority to use its discretion to make reasonable determinations in the administration of coverage," which included "decisions concerning eligibility for benefits, coverage of services, care, treatment, or supplies, and reasonableness of charges." (Tr. at 66.)

B.    <u>The Precipitating Incident and Resulting Treatment at Open Sky</u>

Prior to the treatment in this case, L.B. had a history of mental-health and substance-abuse concerns. (Tr. at 1129-32.) Such issues included incidents of serious intoxication, an eating disorder, and threats of suicide. (Tr. at 1129-32.) At some unspecified time, L.B. "was hospitalized at the Psychiatric Unit of Carolinas Medical Center." (Tr. at 1130.)

In one incident in May 2017, L.B. "became extremely intoxicated," Carl called 911, a Sheriff's Deputy arrived, and L.B. threw a vase down the stairs, which shattered, causing a piece of the vase to "cut the Deputy's head severely." (Tr. at 1130.) As a result, L.B. was arrested for "Felony Assault on a Law Enforcement Officer." (Tr. at 1130.)

About a month after this incident, in June of 2017, Carl contacted a Therapeutic and Educational Consultant to find programs for L.B. (Tr. at 791, 1130-31.) This led to L.B.'s admission to Open Sky's residential behavioral health program a month later on July 14, 2017. (Tr. at 1130-32, 1349-50.) Neither Carl nor L.B. sought pre-authorization from Defendants for this residential mental health treatment.

The records from Open Sky do not document L.B.'s condition at admission, but a treatment plan four days later reflects diagnoses of "Generalized Anxiety Disorder," "Alcohol Use Disorder, Mild," "Other Specified Eating Disorder, Bulimia nervosa of low frequency," and "Attention-Deficit/Hyperactivity Disorder, Combined Presentation." (Tr. at 757; <u>see also</u> Tr. at 147, 150, 153, 156, 159, 1322-25, 1349-50, 1379-80, 1400-03.) L.B. underwent a psychological assessment on August 30, 2017, six weeks after her arrival, and that assessment reflects that with respect to her "Presenting Problem", L.B. "indicate[d that] she was enrolled at Open Sky due to significant issues with anger, threatening suicide, and legal issues," while

10

her mother reported enrolling L.B. in the program "due to issues related to intense anger, difficulty controlling her emotions, and an eating disorder." (Tr. at 1331.) In addition to setting goals to address these conditions, L.B.'s treatment at Open Sky consisted of:

> weekly individual and group therapy sessions with a master's or Ph.D. level therapist; daily one-on-one sessions with field guides; daily process groups with peers and field guides; therapeutic and wilderness skills assignments outlined in the Student Pathway workbook; daily mindfulness activities such as journaling, yoga, and meditation; cooking and eating organic, whole foods; peer mentoring activities; solo experiences; transition ceremonies to mark movement through growth stages; treatment of substance abuse, chemical dependency, or other addictive behavioral patterns when indicated via Open Sky's Integral Recovery Twelve Steps Workbook.

(Tr. at 1322.) L.B. left Open Sky after just over two months, on September 27, 2017. (Tr. at 1130-32, 1321-28.)

C.    The Claims Process and Appeals

Following L.B.'s September 2017 discharge, Carl sent claims forms to Blue Cross NC for reimbursement on October 20, 2017, seeking $42,940 in total costs resulting from L.B.'s treatment at Open Sky. (Tr. at 143-62.) On November 2, 2017 and January 8, 2018, Blue Cross NC sent requests to Carl for additional information (Tr. at 163-77), but he never responded.[3] In June 2018, Open Sky submitted claims directly to the Colorado Blue Cross and Blue Shield licensee, which processed the claims and ultimately transmitted the claims to Blue Cross NC. On July 3, July 4, and August 14, 2018, Blue Cross NC sent Plaintiffs

---

[3] The Plan provides that for retrospective review, decisions would be made within 30 days, but "[i]f more information is needed, before the end of the initial 30-day period, BCBSNC will let you know of the information needed. You will then have 90 days to provide the requested information. As soon as BCBSNC gets the requested information, or at the end of the 90 days, whichever is earlier, BCBS will make a decision within 15 days." (Tr. at 57-58.)

explanation of benefits (hereinafter, "EOB") letters, denying coverage of L.B.'s stay at Open Sky because the services were provided without prior authorization. (Tr. at 672-91.)

In December 2018, Plaintiffs sought retrospective review of Blue Cross NC's EOB denial letters, arguing that L.B. had suffered an emergency under the Plan that excused Plaintiffs from first seeking prior authorization. (Tr. at 692-700.) Plaintiffs' request included, among other things, copies of L.B.'s treatment records from Open Sky and supporting letters from therapist Robert Adelman, M.S.W., and Therapeutic and Educational Consultant Ashley Barbour. (Tr. at 727-92.) Blue Cross NC in turn forwarded the request and supporting documents to Magellan. (Tr. at 801.) Upon review, Magellan determined, via a March 5, 2019, determination letter, that L.B.'s residential treatment was not medically necessary, and therefore not "appropriate for payment purposes." (Tr. at 925-27.) In particular, Magellan found:

> Your symptoms do not appear to require a 24-twenty four (24) hour per day, seven (7) day per week treatment facility to help you learn how to take care of your daily living needs for one or more of the following reasons: You are reported to be able to care for you physical needs. You are not reported to be at risk of being dangerous to yourself or others. Where you live does provide the help you need to get better. Your current symptoms would be safely treated at a less restrictive level of care.
>
> Therefore, Magellan is unable to authorize Residential Mental Health Treatment July 14, 201[7] through October 31, 2017.

(Tr. at 926.)

Plaintiffs appealed this determination in August 2019. (Tr. at 1120-46.) Plaintiffs contended that L.B.'s treatment at Open Sky was medically necessary (Tr. at 1122-46), and included as exhibits medical records that they had previously submitted in their request for retrospective review (compare Tr. at 727-84, and Tr. 787-92, with Tr. at 1313-76). As part of

12

their appeal Plaintiffs also requested Magellan's Care Guidelines and "all documents under which [the] plan is operated." (Tr. at 1125, 1145-46.)

Magellan denied Plaintiffs' appeal on September 9, 2019, again finding that the treatment was "not medically necessary." (Tr. at 1425-28.) The contractual basis for the denial was that this treatment was not a covered benefit because it was not medically necessary. (Tr. at 1427.) The clinical basis for the denial was that, at the time of admission, L.B. was "not at risk of harm to [herself] or others," was "not engaging in self-harm behaviors," "did not have active substance abuse concerns," was "not having active symptoms of an eating disorder at the time of admission," and was "medically stable and able to care for [her] needs." (Tr. at 1427.)

Following this denial, Plaintiffs brought suit on September 9, 2020 [Doc. #2].

IV.   DISCUSSION

In opposition to Defendant's Motion for Summary Judgment, and in support of their own Motion for Summary Judgment, Plaintiffs argue that Blue Cross NC abused its discretion in denying the benefits claim. Under the applicable standard of review, a determination is not an abuse of discretion if it is reasonable, that is, the result of a deliberate, principled reasoning process and supported by substantial evidence. Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997). "Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that a reasoning mind would accept as sufficient to support a particular conclusion." Donnell v. Metro. Life Ins. Co., 165 F. App'x 288, 295 (4th Cir. 2006) (internal quotation omitted).

Case 1:22-cv-00084-TDS-JEP   Document 135   Filed 08/19/24   Page 13 of 29

In alleging abuse of discretion, Plaintiffs focus on four of the relevant factors identified by the Fourth Circuit in <u>Booth</u>, 201 F.3d 342, grouping two of the factors together. Specifically, Plaintiffs contend that Defendants (1) failed to comply with the procedural requirements of ERISA, (2) failed to engage with and adequately consider the record evidence and failed to follow a reasoned and principled process, and (3) failed to properly apply the Plan's terms. (Pls.'s Am. Br. at 9, 10-23.) The Court considers each of these contentions in turn.

A.    <u>Violations of ERISA's Procedural Standards</u>

Plaintiffs first allege that Defendants violated ERISA's procedural standards by failing to respond to Plaintiffs' claims filing and appeals in the timeframe mandated by the ERISA regulations (Pls.'s Am. Br. at 12-13), by failing to cite specific plan language as required by the regulations (Pls.'s Am. Br. at 13), by failing to identify the healthcare professional who assisted Defendants in making their claim determinations (Pls.'s Am. Br. at 14, 16), and by failing to provide documents which Plaintiffs requested from Defendants during the claims process, but never received (Pls.'s Am. Br. at 14-17, 21-22).

The Fourth Circuit has made clear that it "will not find an abuse of discretion based on ERISA procedural violations [under § 2560.503-1] absent a causal connection between procedural defects and the final denial of a claim." <u>Donnell</u>, 165 F. App'x at 297 (internal brackets and quotation omitted). In <u>Donnell</u>, the plaintiff argued, as Plaintiffs do here, that the defendant's "initial termination letter violated 29 C.F.R. § 2560.503-1 by failing to outline the evidence necessary to perfect her appeal or to inform her of her right to review the administrative record" and that the defendant further violated Section 2560.503-1 by making

14

an untimely decision. <u>Donnell</u>, 165 F. App'x at 296. However, because the plaintiff failed to show a link between the noncompliance with Section 2560.503-1 and the denial of her claim, the procedural violation did not change the determination that the plan administrator did not abuse its discretion. <u>Donnell</u>, 165 F. App'x at 296-97.

In other words, at least in the Fourt Circuit, "noncompliance with § 2560.503-1 is not an abuse of discretion and does not require de novo review absent proof that the plan participant was prejudiced." <u>Benzing v. USAA Officer Severance Plan</u>, No. 3:22-cv-146-MOC-SCR, 2023 WL 6307079, at *9 (W.D.N.C. Sept. 27, 2023). Therefore, "[a]bsent an allegation or evidence that Plaintiff has been harmed," and where "the record contains no evidence that Plaintiff has been prejudiced by these procedural violations and Plaintiff does not allege prejudice or harm as a result of the procedural deficiencies," a court should find that such technical violations "do not constitute an abuse of discretion." <u>Potter v. Shoney's, Inc.</u>, 108 F. Supp. 2d 489, 495 (M.D.N.C. 1999).[4]

---

[4] Plaintiff correctly quotes <u>Thompson v. Life Insurance Co. of North America</u>, 30 F. App'x 160, 163 (4th Cir. 2002), for the proposition that "procedural safeguards are at the foundation of ERISA." (Pls.'s Am. Br. at 11.) <u>Thompson</u>, however, involved an attempt by the insurance company to deny coverage based on a new reason raised for the first time on judicial review. The Court concluded that "allowing LINA to raise a new basis for denial would deprive Mr. Thompson of the procedural fairness guaranteed to claimants under ERISA. Quite simply, Mr. Thompson and every other claimant is statutorily entitled to expect that plan administrators will follow mandatory rules of procedure. LINA had a fiduciary duty to consider Mr. Thompson's claim fully and fairly and to provide him with the specific disqualifying reason or reasons. A district court's review is limited to whether the rationale set forth in the initial denial notice is reasonable. A court may not consider a new reason for claim denial offered for the first time on judicial review." <u>Thompson</u>, 30 F. App'x at 163-64 (internal citation omitted). In the same way, in the present case, the Court is not considering new rationales not relied upon to deny the claims during the administrative process, but Plaintiffs have not alleged any prejudice with regard to the other alleged procedural violations. Plaintiffs do contend that they would have submitted additional evidence regarding L.B.'s condition if they had received more specific reasons for the denials. However, the denials were sufficiently specific to allow Plaintiffs to know what information to submit, and indeed Plaintiffs did submit all of the records from Open Sky and letters from L.B.'s therapist and educational consultant. Even in this proceeding, Plaintiffs still have not presented additional evidence to show prejudice, and there are no facts that would establish that Plaintiffs were denied full and fair review or that Plaintiffs could not formulate a meaningful appeal as a result of the alleged procedural violations. Further, the Court also notes that even if there were prejudice, the remedy would not be an award of benefits, but would instead be a

15

As in <u>Potter</u>, Plaintiffs do not even argue, let alone show based on the record, that there was any causal connection between any delay or other procedural violation in this case and the final determination, nor that Plaintiffs were prejudiced in any way by this delay or any other purported procedural deficiencies. Thus, all of Plaintiffs' related arguments that mere regulatory deficiencies alone establish an abuse of discretion and/or require reversal (Pls.'s Am. Br. at 11-13, 16), should be rejected.

As an example, Plaintiffs allege that Blue Cross NC's retrospective review "denial did not cite any Plan language," (Pls.'s Am. Br. at 13), and that when it did reference Plan language in other parts of the review process it cited "a section of the plan titled, 'Covered benefits, Determination of medical necessity' that does not exist" (Pls.'s Am. Br. at 14) (citing Tr. at 1427). However, Plaintiffs do not argue, let alone show, how these failures to directly cite Plan language prejudiced Plaintiffs or affected the outcome of the decision. Moreover, at least in this case, it is reasonably apparent—given the context of Defendants' refusal to provide

---

determination that the claim should be re-evaluated by the administrator with an opportunity for Plaintiffs to present the evidence they contend could have been presented if they had received more specific reasons for the denial, but the plan administrator could then conduct a new review, including with respect to whether there was an emergency and whether other terms of the Plan precluded an award of benefits.

Plaintiffs also cite <u>Mondry v. American Family Mutual Insurance Co.</u>, 557 F.3d 781, 798 (7th Cir. 2009), for the proposition that failure to provide internal guidelines as required by ERISA may be a basis for judgment in their favor. (Pls.'s Am. Br. at 15.) However, <u>Mondry</u> did not involve a denial of benefits reviewed for abuse of discretion, and instead involved a claim for statutory fines under 29 U.S.C. § 1132(c)(1)(B) for failing to provide documents as required under 29 U.S.C. § 1024(b)(4). Plaintiff does not bring such a claim in this case. Instead, the only claim at issue in this case is the claim for benefits due under the terms of the Plan under 29 U.S.C. § 1132(a)(1)(B), with review of the denial of benefits for abuse of discretion.

Plaintiffs also cite <u>Wilson v. UnitedHealthcare Insurance Co.</u>, 27 F.4th 228, 247 (4th Cir. 2022) for the proposition that it is an abuse of discretion to fail to provide requested documents. (Pl.'s Am. Br. at 16.) However, <u>Wilson</u> was a case where the defendant's failure to provide documents had prevented plaintiff from perfecting an appeal, and this failure thereby excused the plaintiff from having to exhaust her remedies prior to bringing suit. The court did not find that merely failing to provide the documents was itself an abuse of discretion.

benefits on retrospective review because it deemed that treatment was not medically necessary (Tr. at 925-27, 1425-28)—that this citation referred to the portion of the plan dealing with retrospective review of inpatient services and Residential Treatment Facility services obtained without preauthorization, stating that "[a]ll decisions will be based on MEDICAL NECESSITY and whether the service received was a benefit under this health benefit plan," and the corresponding definition of MEDICAL NECESSITY, which included a provision that Blue Cross NC may compare alternative services and settings to determine "in what setting medically necessary services are eligible for coverage." (Tr. at 42, 57-58, 79.)

Finally, Plaintiffs argue that summary judgment in their favor is appropriate because Defendants represented to Plaintiffs that their decision was based on the medical opinion of Dr. LaShondra Washington, when in fact Dr. Diana Antonacci, "not Dr. Washington, performed the medical review." (Pls.'s Am. Br. at 14.) To the extent Plaintiffs argue that this was procedurally incorrect, they do not point to any causation or prejudice arising from this purported error and, for the same reasons noted above, this argument should be rejected. See Benzing, 2023 WL 6307079, at *9; Potter, 108 F. Supp. 2d at 495. In any event, the fact that a separate doctor reviewed the record first (Tr. at 1418-24), and Dr. Washington did a subsequent review (Tr. at 1426) and concurred in the finding of the first doctor, does not mean that Dr. Washington was not the physician who performed the medical review. Thus, Defendants' statement that Dr. Washington made this determination, even if based in part on the preliminary opinion of a fellow physician, is neither false nor a material misrepresentation.[5]

---

[5] Plaintiffs initially argued that there potentially was no board-certified doctor known as "Dr. Washington" in the state. (See Pls.'s Br. [Doc. #99] at 14.) Plaintiffs subsequently retracted that argument [Doc. #110]. (See Pls.'s Am. Br. at 14.)

For these reasons, Plaintiffs' arguments that Defendants violated ERISA's procedural strictures in such a way to establish abuse of discretion should be rejected.

B.    Adequacy of Materials Considered and Reasoned Decisionmaking Process

Plaintiffs argue that Defendants abused their discretion by "fail[ing] to cite – much less meaningfully engage with – the record" in their decision denying benefits and that none of Defendants' reasons for denial were supported by the record. (Pl.'s Am. Br. at 17-19.) The Court disagrees.

In its initial EOB letters in 2018, Blue Cross NC explained that coverage was denied because the services had been provided without authorization. (Tr. at 672-74, 678-81, 686-87.) Under the terms of the Plan, this alone would have been a sufficient reason for denial of coverage for the type of residential treatment sought in this case. However, Plaintiffs sought retrospective review of this determination on the basis of an emergency situation. (Tr. at 694.) Thus, the subsequent decisions and appeals were conducted in the context of determining whether an emergency occurred warranting an exception to the Plan's acknowledged requirement for preauthorization for the type of care L.B. received.

Magellan initially denied coverage on retrospective review because the treatment was not medically necessary:

> Magellan Healthcare, Inc. (Magellan) has been authorized by Blue Cross Blue Shield of North Carolina (BCBS NC) to administer its behavioral health benefits. As such, we are responsible for reviewing mental health and/or substance abuse treatment to ensure that it is medically necessary and appropriate for payment purposes.
>
> BCBS NC requires that the covered service or treatment is medically necessary. Please review your benefit plan description for more information and details about your benefits.

18

We recently conducted a review for Residential Mental Health Treatment for the above-named member with the provider and/or facility.

Our Physician Advisor, a Board Certified Psychiatrist licensed in North Carolina, determined that Residential Mental Health Treatment is not medically necessary based on the 2019 Magellan Care Guidelines, Residential Behavioral Health Level of Care, Adult and Geriatric for the following reason(s):

You presented with Generalized Anxiety Disorder, Bulimia Nervosa, Attention Deficit Hyperactivity Disorder, Substance Use Disorder. Magellan Care Guidelines, MCG Care Guidelines, for Residential Behavioral Health Level of Care, Adult and Geriatric treatment have not been met. Your symptoms do not appear to require a 24-twenty four (24) hour per day, seven (7) day per week treatment facility to help you learn how to take care of your daily living needs for one or more of the following reasons: You are reported to be able to care for your physical needs. You are not reported to be at risk of being dangerous to yourself or others. Where you live does provide the help you need to get better. Your current symptoms would be safely treated at a less restrictive level of care.

Therefore, Magellan is unable to authorize Residential Mental Health Treatment July 14, 201[7] through October 31, 2017.

(Tr. at 925-26.) The record reflects that in reaching this decision, Plaintiff's medical records and appeal request were reviewed by at least two medical professionals, who explained their reasoning and analysis. First, the records were reviewed by Licensed Professional Counselor M. Bender, who set out L.B.'s clinical summary at length, noting L.B.'s anxiety, history of binging and purging after nights of drinking, history of anger issues, history of threatening suicide, legal issues earlier in 2017, use of alcohol one time per week or one time every two weeks, past use of alcohol resulting in ER visit, and outpatient treatment weekly or every other week prior to admission. (Tr. at 804.) LPC Bender concluded that L.B. did not clearly need residential treatment, and therefore sent the file for further review by a physician. Dr. Candice Tate then conducted an extended review of the records. Dr. Tate noted that the records from Open Sky were not structured to determine what the presenting issues were. (Tr. at 805.) Dr.

19

Tate noted that "there is no admission note" and "psychological testing was not started until 8/30/17 and psychiatric assessment started on 9/18/17 per the discharge summary." (Tr. at 805.) In this regard, as noted above, the records do not show any treatment plan until several days after admission, and do not reflect any psychological assessment until August 30, 2017, six weeks after her arrival. (Tr. at 757-58, 738-39.) Dr. Tate also noted the reference in the psychological testing to L.B.'s history of threatening suicide, including at the time of the incident with the officer, but there were no records indicating that she was threatening suicide at the time of admission. Dr. Tate also noted that her bulimia was described as "low frequency." (Tr. at 805.) Based on this review, Dr. Tate concluded that there was no suicidal or homicidal ideation at the time of admission, that L.B. was able to perform her activities of daily living and care for herself, that the appropriate level of care was intensive outpatient care rather than residential treatment, and that services at the level of a residential treatment center were more intensive than medically necessary. (Tr. at 805-807.)

Plaintiffs appealed this decision in a detailed letter that again included all of L.B.'s records from Open Sky. (Tr. at 1122-46.) In its ultimate denial, dated September 9, 2019, Magellan reviewed, among other things, L.B.'s "Medical records from Open Sky Wilderness Therapy for dates of service from July 14, 2017 through September 24, 2017," and again denied coverage, stating:

> This denial decision was based upon the covered benefits/determination of medical necessity described in your certificate of coverage. Please reference your certificate of coverage under the section <u>Covered benefits, Determination of medical necessity</u> for a full explanation of the coverage available.
>
> . . . .

You presented with diagnoses including an anxiety disorder, an eating disorder, a substance use disorder, and ADHD. At the time of admission, you were not at risk of harm to yourself or others. You were not engaging in self-harm behaviors. You did not have active substance abuse concerns at the time of admission. You were not having active symptoms of an eating disorder at the time of admission. You were medically stable and able to care for your needs at the time of admission. Magellan Care Guidelines, MCG Care Guidelines for Residential Behavioral Health Level of Care, Child or Adolescent treatment have not been met. Your symptoms do not appear to require a 24-hour per day, 7 day per week treatment facility to help you learn how to take care of your daily living needs for one or more of the following reasons:
- You are able to care for your physical needs.
- You are not at risk of being dangerous to yourself or others.
- Where you live does provide the help you need to get better.
- Your current symptoms would be safely treated at a less restrictive level of care.

(Tr. at 1427.) The record reflects that this determination was a result of review by two additional physicians. First, Magellan sent the medical records, correspondence, and appeal documents to an outside psychiatrist, Dr. Diana Antonacci, who summarized the records and set out her analysis at length. (Tr. at 1421-23.) Dr. Antonacci concluded that at the time of admission, based on the Open Sky records, L.B. had no active suicidal ideation with intention or a plan, no homicidal ideation, no psychotic symptoms, and could care for her basic needs, with no self-injurious behavior. (Id.) Dr. Antonacci further noted that there was a history of abusing alcohol but no active substance abuse concerns. (Id.) Dr. Antonacci noted that the records reflected a past history of 20 days of residential treatment for eating disorder symptoms, but no evidence that L.B. was at a dangerous weight or actively engaged in compensatory eating disordered behavior. (Id.) Dr. Antonacci also noted that L.B.'s family was open and engaged in treatment, and that L.B. expressed motivation for treatment and recovery. (Id.) Based on her review, Dr. Antonacci concluded that medical necessity guidelines for admission to mental health residential level of care were not met because there

21

was no evidence L.B. could not receive sufficient treatment and access to services outside of a residential setting, and Dr. Antonacci identified mental health intensive outpatient treatment as an alternative. (Tr. at 1422-23.) The evaluation was then reviewed by yet another physician, Dr. LaShondra Washington, a Senior Medical Director at Magellan. (Tr. at 1418.) Dr. Washington reviewed the documentation and concluded that she was in agreement with the third-party reviewer, Dr. Antonacci. Dr. Washington then wrote the analysis and conclusions that were set out in the denial letter, explaining that L.B.'s symptoms did not appear to require a 24-hour per day, 7 day per week treatment facility, because she could care for her physical needs, was not at risk of being a danger to herself or others, had a place to live that could provide the help she needed to get better, and could be safely treated at a less restrictive level of care. (Tr. at 1418.)

These determinations by four different medical professionals find substantial support in the record, and reflect a reasoned and principled decision-making process. The evidence submitted by Plaintiffs does not reflect that this determination was unreasonable or an abuse of discretion. For instance, Plaintiffs point to a letter from one of L.B.'s previous therapists, Rob Adelman, M.S.W. However, in the letter, Mr. Adelman mentioned prior, non-dated and non-specific substance-abuse issues that led to treatment for L.B. in the past, but did not even cursorily state that L.B. suffered an emergency requiring treatment at Open Sky, nor did he opine that residential treatment was medically necessary or that L.B.'s symptoms could not safely be treated in an intensive outpatient program. (Tr. at 788-89.) Mr. Adelman in fact called L.B.'s continuing problems with "alcohol abuse, eating difficulties, mood lability, chronic anxiety, impaired family and peer relations and increasing safety concerns" as being

merely "episodic." (Tr. at 789.) Further, Dr. Antonacci and Dr. Washington considered this letter, as well as the letter from Plaintiffs' educational consultant, in reaching their conclusions. In the circumstances, Defendants acted reasonably in determining that L.B.'s "episodic" history of problems was not sufficient to show that treatment at Open Sky was medically necessary.[6]

Nor did that fact that L.B. reportedly binged and purged while at Open Sky contradict Defendants' finding that, at the time of her admission, she was not at risk of harming herself or exhibiting active signs of substance abuse. A fair reading of Blue Cross NC's decision was that, while noting that L.B. had been diagnosed with an eating disorder and had a history of substance abuse, she was not actively exhibiting these symptoms at the time of entry into Open Sky, at least at a level that required 24-hour residential treatment. As noted above, Dr. Antonacci specifically noted that there was no evidence that she was at a dangerous weight, no evidence she was actively engaged in compensatory eating-disordered behavior at the time of admission, and no evidence of bio-medical instability. (Tr. at 1422-23.) Dr. Antonacci also noted her history of treatment for eating-disordered symptoms, but no documentation of hospitalization or of attempting intensive outpatient treatment, and also noted that L.B.'s family was open and engaged in treatment and that L.B. was motivated to engage in treatment and recovery. These determinations were reviewed and adopted by Dr. Washington. Taken together, this is a reasonable explanation for finding that intensive outpatient treatment was appropriate but residential treatment was not medically necessary. Ultimately, "[s]o long as

---

[6] Indeed, the delay of two months between the precipitating event—L.B.'s arrest for assaulting a member of law enforcement in May 2017—and her starting treatment on July 14, 2017, supports a finding that the symptoms did not require residential treatment and could be treated outside of a residential treatment setting.

23

sufficient evidence supports the decision, and the process by which the determination was made is principled and reasoned," a court has no basis "to second-guess an administrator's denial of benefits." Wilson, 27 F.4th at 240.

Defendants' determinations that L.B. could care for her own needs, was not at risk of harming herself or others at the time of admission to Open Sky, and could be safely treated at a less restrictive level of care without the residential program she selected were all reasonable and supported by the record. Given the detailed review and the analysis by multiple doctors, the record reflects a reasoned and principled decision-making process and a detailed engagement with the medical record, and these factors do not show an abuse of discretion.

C.    Analysis of the Plan's Terms

Finally, Plaintiffs argue that Defendants abused their discretion in how they analyzed and interpreted the Plan's terms, resulting in what Plaintiffs allege were inconsistent decisions on what the Plan required. In particular, Plaintiffs fault Defendants' reliance on the fact that L.B. did not appear to require "a 24-hour per day, 7 day per week treatment facility," and being "medically stable," despite nothing in the Plan limiting residential treatment to such acute needs. (Pls.'s Am. Br. at 21) (quoting Tr. at 42, 81). However, as noted above, the Plan's terms required prior review and certification for Residential Treatment Facility services, and where prior authorization was not obtained, retrospective review could be requested for an emergency and would be based on Medical Necessity. (Tr. at 57-58.) The definition of Medical Necessity specifically provided that "BCBSNC may compare the cost-effectiveness of alternative services, settings or supplies when determining which of the services or supplies will be covered and in what setting medically necessary services are eligible for coverage." (Tr.

24

at 79.) As with all care, Defendants had the discretion to deny coverage which it reasonably determined was not medically necessary. (Tr. at 66.) In this context, the language used by Defendants in denying coverage was related to the Plan's language and, separately, directly responsive to the arguments raised by Plaintiffs in seeking coverage.[7]

### D. Conclusion as to Abuse of Discretion Determination

The evidence in the record reflects that the denial of benefits was not inconsistent with the Plan language, and that materials considered included all of the Open Sky medical records and the letters from L.B.'s therapist and her educational consultant, which were analyzed in detail by multiple physicians to support the determination, that this reflects a reasoned and principled decision-making process, that a sufficient explanation of the conclusions was provided to Plaintiffs in the denial letters such that Plaintiffs were able to meaningfully respond, that any procedural violations did not prejudice Plaintiffs, and that ultimately Defendants did not abuse their discretion in denying coverage under either ERISA or the Plan's plain terms and thus summary judgment in Defendants' favor should be granted.[8]

---

[7] Plaintiffs also contend that in the final denial letter, Defendants cited to a later version of the Magellan Child and Adolescent Guidelines rather than the Adult Guidelines. However, the record itself reflects that the 22nd Edition of the Adult Guidelines were used in both levels of review. (Tr. at 1080-1118, 1451-89.) Moreover, Plaintiffs have not shown how this would have made any difference to the determinations in this case.

[8] The Parties disagree over whether Defendant "Blue Options PPO" is the appropriate Plan that may be sued as a defendant in an ERISA action. (Defs.'s Br. at 23-24; Pls.'s Resp. Br. [Doc. #113] at 23.) As noted in the prior recommendation on Defendants' Motion to Dismiss [Doc. #77], this Court has previously held that proper defendants in an action pursuant to 29 U.S.C. § 1132(a)(1)(B) are the "plan itself as an entity and any fiduciaries who control the administration of the [] plan." McRae v. Rogosin Converters, Inc., 301 F. Supp. 2d 471, 475 (M.D.N.C. 2004); see also Coleman v. Provident Life & Accident Ins. Co., No. CCB-10-1959, 2011 WL 1980541, at *2 (D. Md. May 20, 2011) (same). In any event, given that the Court recommends that this matter be dismissed in its entirety, the issue of whether the appropriate Plan was named as a Defendant is rendered moot because, regardless of the name of the Plan, the claims against Blue Cross NC and the Plan at issue should be dismissed.

V.    MOTIONS TO SEAL

Also before the Court are various joint and un-opposed Motions to Seal, which seek to seal portions of the Administrative Record and the Parties' briefs by making narrow redactions and selective withholdings of L.B.'s private health information and non-party Hearst Corporation's proprietary guidelines [Doc. #93, #98, #104, #112, #115, #123, #128, #131].

The public right of access to judicial records finds its basis in both the common law and the First Amendment.  See Rushford v. New Yorker Mag., Inc., 846 F.2d 249, 253 (4th Cir. 1988).  With respect to the documents and information at issue in the present case, the Fourth Circuit has "squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion."  Doe v. Pub. Citizen, 749 F.3d 246, 267 (4th Cir. 2014) (citing Rushford, 846 F.2d at 252-53).   When the First Amendment is implicated, the court may grant a motion to seal only upon a showing of a compelling interest, and only if the sealing is narrowly tailored to serve that interest.  See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004).  "A district court must . . . weigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing."  Id. at 576; see also Fernandez Gonzalez v. Cuccinelli, 985 F.3d 357, 376 (4th Cir. 2021) ("To seal a document, the district court must (1) give the public adequate notice of a request to seal and a reasonable opportunity to challenge it, (2) consider less drastic

26

alternatives to sealing, and (3) if it decides to seal, state the reasons, supported by specific findings, behind its decision and the reasons for rejecting alternatives to sealing.").

Here, the Parties' Motions to Seal have been publicly docketed for several months with no public objection. Interested non-parties have therefore had a reasonable amount of time to contest the sealing of the information at issue, although no one has done so. Accordingly, the notice requirement has been met. See Hunter v. Town of Mocksville, 961 F. Supp. 2d 803, 806 (M.D.N.C. 2013) (finding "public notice" requirement met where motion to seal had been publicly docketed for one month).

With respect to the medical records and related briefing, the proposed sealed exhibits contain L.B.'s "confidential sensitive and personal medical information, the protection of which serves an important governmental interest." Fulp v. Columbiana Hi Tech, LLC, No. 1:16CV1169, 2018 WL 1027159, at *10 (M.D.N.C. Feb. 21, 2018). In addition, the sealing that the Parties seek is narrowly tailored to limited redactions and selective withholdings from the medical records, rather than entirely sealing them all. Balancing the compelling interest to protect L.B.'s private medical information with the First Amendment right of access, the Court will grant the request to seal as it is narrowly tailored, and there is sufficient public information to explain the Court's reasoning. See id. (granting the motion to seal where there was "no less restrictive way to serve that interest than sealing the entirety of those medical records because of the breadth of confidential information throughout the records").[9]

---

[9] The Court notes that the medical information has been set out in this Recommendation to the extent necessary to explain the reasoning and address Plaintiffs' contentions. Much of this information is generally available in the publicly-filed Complaint. However, the Court has used initials in this Recommendation to help reduce the public disclosure and protect L.B.'s privacy interests, following the similar practice used in cases involving Social Security appeals. It is not feasible to redact L.B.'s identifying information from all of the records, so sealing the requested portions of the records is the narrowest feasible option.

The Motions to Seal also request sealing of Magellan's internal guidelines (Tr. at 1451-506), at the behest of the Hearst Corporation, from whom Magellan licenses the guidelines. Magellan subsequently presented further briefing and evidence in support of the sealing [Doc. #108, #109, #126, #134], reflecting that these documents are commercially sensitive, confidential business information, and that their public disclosure would cause serious economic injury to Magellan. Magellan points to 2023 decision in the District of Utah, <u>Anne A. v. United Healthcare Insurance Co.</u>, No. 2:20-cv-00814, 2023 WL 197301 (D. Utah Jan. 17, 2023), in which the court undertook an extended analysis of a request to seal these same guidelines. In that case, the court concluded that while the documents could be made available to Plan members, they were not available to the general public and should be sealed. Given the analysis in that case, and given that no one has filed any objection to the sealing request or presented a contrary argument, the Court concludes that Magellan has presented a compelling interest and has narrowly tailored the request to just its proprietary information, and that sealing request will likewise be granted.

Finally, the Court notes that Defendants have filed an un-opposed motion [Doc. #120] seeking permission to manually file a claims spreadsheet attached as an exhibit to another filing [Doc. #117-1] in a conventional format rather than by filing the same on ECF. Because copies of the same documents were also sent to Plaintiffs, and because the format they are in make filing on ECF impractical, the Court will grant that motion.

VI.  CONCLUSION

IT IS THEREFORE ORDERED that the Parties' Motions to Seal [Doc. #93, #98, #104, #112, #115, #123, #128, #131] are GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Leave to Conventionally File [Doc. #120] is GRANTED.

IT IS RECOMMENDED that Plaintiffs' Motion for Summary Judgment [Doc. #96] be DENIED, Defendants' Motion for Summary Judgment [Doc. #102] be GRANTED, and that this matter be DISMISSED with prejudice.

This, the 19th day of August, 2024.

Joi Elizabeth Peake
United States Magistrate Judge